FILED

FEB 0 2001

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----ooOoo----

CALIFORNIA INDEPENDENT SYSTEM
OPERATOR CORPORATION,

       Plaintiff,

   v.

RELIANT ENERGY SERVICES, INC.,
et al.,

       Defendants.

NO. CIV. S-01-238 FCD/JFM

TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE

----ooOoo----

Plaintiff California Independent System Operator Corporation ("the ISO") brings this action against defendants Reliant Energy Services, Inc., Reliant Energy Ormand Beach LLC, Reliant Energy Mandalay, LLC, Reliant Energy Etiwanda, LLC, Reliant Energy Coolwater, LLC, Reliant Energy Ellwood, LLC (collectively "Reliant"), Williams Energy Marketing & Trading Company ("Williams"), AES Pacerita Inc., AES Alamitos, LLC, AES Huntington Beach, LLC, AES Redondo Beach, LLC (collectively "AES"), and Dynegy Power Corporation ("Dynegy"), seeking an injunction requiring defendants to perform their obligations pursuant to the California Independent System Operator

Corporation Electric Tariff ("ISO Tariff").[1] Specifically, the ISO seeks to ensure defendants' compliance with the provisions of the ISO Tariff relating to defendants' obligation to respond to emergency dispatch orders.

This matter is before the court on the ISO's application for a temporary restraining order and order to show cause why a preliminary injunction should not issue requiring defendants to comply with their obligations under the ISO Tariff. See Fed. R. Civ. P. 65; E.D. Cal. Local Rule 65-231. By this order, the court now renders its decision.

## BACKGROUND

### California's Electric Power Market

The ISO is responsible for controlling and maintaining California's electric power transmission grid. As part of its responsibilities, the ISO acts as a power "broker" between the generators and utilities. These transactions are governed by the ISO Tariff.

The ISO operates in both the "advance market" and the "real time market." In the advance market, the ISO accepts and coordinates power "schedules" submitted by utilities that qualify as "scheduling coordinators." These schedules represent advance statements of the quantities of electricity the scheduling coordinator anticipates its customers will consume the day after

---

[1] The ISO filed a verified complaint and ex parte application for temporary restraining order against Reliant on February 6, 2001. Later that same day, the ISO filed a second complaint and ex parte application for temporary restraining order against the remaining defendants. The allegations contained in the complaints are substantially similar and the requests for relief are virtually identical.

2

1  the schedule is submitted, together with quantities of electric
2  generation that the scheduling coordinator anticipates having
3  available the next day to meet those projected demands.  This
4  process is repeated an hour before actual operations, to give the
5  utilities a chance to make adjustments to their schedules to
6  account for changes in weather, the status of generating units
7  and other factors.  See ISO Tariff §§ 2.2.3, 2.2.11 - 2.2.13.

8  Even with the opportunity for hour-ahead adjustments, actual
9  demands of customers for electricity and actual output of
10 generating units may differ from the demands and operating levels
11 reflected in the utilities' schedules.  The ISO has the
12 responsibility of ensuring that unscheduled demands for
13 electricity in real-time operations are matched by additional
14 electricity from generating units.  If customer demand is not met
15 by scheduled supplies in the advance market, the ISO must procure
16 additional electricity to maintain the reliability of the
17 transmission grid and serve customer demand.  To meet unscheduled
18 demands, the ISO accepts bids from generators to supply
19 electricity in real time.  When the amount of electricity offered
20 by such bids is insufficient, the ISO issues dispatch
21 instructions to its participating generators which are obligated,
22 under the ISO Tariff, to supply power when called upon by the ISO
23 to avert an emergency situation.  See ISO Tariff § 5.1.3.  If the
24 ISO is unable to obtain sufficient power through the issuance of
25 emergency dispatch orders, it must order rolling blackouts in
26 order to avoid a system-wide "crash" of the transmission grid.
27 ///
28 ///

**The California Power Crisis**

The serious financial problems of California's investor-owned utilities, Pacific Gas & Electric ("PG&E") and Southern California Edison ("SCE") are well known.[2] As a result of these problems, many power generators, including the defendants herein, are not being paid for much of the power they supply, and are reluctant to continue selling power to the utilities (via the ISO) without an assurance they will be paid. Thus, the ISO has encountered increasing difficulty in procuring power in quantities sufficient to avoid rolling blackouts.

To ensure the continued flow of electricity, on December 14, 2000, the then-Secretary of the United States Department of Energy stepped in and ordered a host of power generators, including the defendants herein, to continue selling power to the California utilities as requested by the ISO.[3] In anticipation of the expiration of that order on February 7, 2001, the ISO sent a letter to generators operating in its market pursuant to the ISO Tariff, requesting assurances that the generators would continue to respond to the ISO's instructions to operate. Defendants' failure to provide adequate assurances in this regard prompted the instant actions.

///
///

---

[2] PG&E and SCE have incurred enormous debts buying wholesale power at prices that exceed the prices they can charge their customers. PG&E and SCE have defaulted on various debts, precipitating financial uncertainty throughout the industry.

[3] The order was subsequently extended by the current Secretary of the United States Department of Energy.

**The Instant Litigation**

The ISO filed this action on the morning of February 6, 2001.  Following a hearing that same day, this court granted the ISO's application for a temporary restraining order as to defendant Reliant, ordering Reliant continue to sell power to the utilities via the ISO.  The order was to remain in effect pending further hearing on the matter on February 7, 2001 at 3:00 p.m.  The remaining defendants stipulated that they would continue to provide power to the ISO in accordance with the ISO Tariff until the conclusion of that hearing, and thus, were not subject to the court's temporary restraining order.

At the February 7, 2001 hearing, the court extended the temporary restraining order against Reliant until 5:00 p.m. (PST) on February 8, 2001, pending issuance of the court's written order.  The remaining defendants again stipulated that they would continue to abide by the provisions of the ISO Tariff until that time.

The court has received and reviewed extensive briefing on the issues presented by the ISO's application for a temporary restraining order.  The court has also given careful consideration to the arguments and testimony presented at the hearings on this matter.  For the reasons set forth below, the temporary restraining order against Reliant shall be extended, and the application for a temporary restraining order as to AES, Dynegy and Williams shall be granted.  These restraining orders shall remain in effect until the conclusion of the hearing on the preliminary injunction, which shall take place on February 16, 2001 at 2:00 p.m.

**ANALYSIS**

The standard for issuing a temporary restraining order is the same as the standard for issuing a preliminary injunction. See Dumas v. Gommerman, 865 F.2d 1093, 1095 (9th Cir. 1989). To qualify for a restraining order, the moving party must show (1) a probability of success on the merits, and (2) the possibility of irreparable injury should the restraining order not issue. See id. These factors represent two points on a sliding scale, such that "the greater the relative hardship to the moving party, the less probability of success must be shown." Sun Microsystems, Inc. v. Microsoft Corp., 188 F.3d 1115, 1119 (9th Cir. 1999) (citation omitted).

**1.  Likelihood of Success**

The ISO seeks to compel defendants to comply with the provisions of the ISO Tariff governing response to emergency dispatch orders. Defendants are obligated to comply with the provisions of the ISO Tariff by virtue of their participation in the California electricity market and use of the California power grid. Defendants have also entered into Participating Generator Agreements with the ISO, which agreements require them, as well as the ISO, to comply with the provisions of the ISO Tariff.

Defendants contend that their obligation to comply with the provisions of the ISO Tariff is discharged by the ISO's failure to comply with the provisions of the ISO Tariff relating to creditworthiness of scheduling coordinators that purchase power from the ISO. The court disagrees. The ISO Tariff has the force

///
///

and effect of a federal statute.[4] See Evanns v. AT&T Corp., 229 F.3d 837, 840 (9th Cir. 2000); Northwestern Public Serv. Co. v. Montana-Dakota Utilities Co., 81 F.2d 19 (9th Cir. 1950), cert. granted, 340 U.S. 806 (1950), aff'd 341 U.S. 246 (1950); Maine Public Serv. Co. v. Federal Power Comm'n, 579 F.2d 659 (1st Cir. 1978); see also 16 U.S.C. § 824d. As such, the ISO's failure to comply with the provisions of the ISO Tariff does not discharge defendants' duties thereunder, as it might if the ISO Tariff was merely a contract between the parties.

Defendants further contend that the relief the ISO seeks is beyond this court's jurisdiction, arguing that it requires this court to enforce a unilateral amendment to the ISO Tariff drafted by the ISO. This amendment, known as "Amendment 36," has been implemented by the ISO, despite the fact that it has not yet been approved by the FERC.[5] Amendment 36 eliminates the credit requirements for scheduling coordinators that purchase power from the ISO. The court agrees that enforcement of Amendment 36 would require the court to modify and/or amend the ISO Tariff, and thus falls outside of its jurisdiction. See Mississippi Power & Light Co. v. Mississippi, 487 U.S. 354, 371, 375 (1988) ("The reasonableness of rates and agreements regulated by FERC may not be collaterally attacked in state or federal courts"; FERC's authority to determine whether rates are "just and reasonable" is exclusive); Nantahala Power & Light Co. v. Thornburg, 476 U.S.

---

[4] The ISO Tariff was filed with and approved by the Federal Energy Regulatory Commission ("FERC") pursuant to Section 205 of the Federal Power Act, 16 U.S.C. § 824d.

[5] The ISO submitted Amendment 36 to the FERC on January 4, 2001. The matter is still pending.

7

953, 966 (1986); <u>Town of Norwood v. New England Power Co.</u>, 23 F. Supp. 2d 109, 115 (D. Mass. 1998). The court disagrees, however, that granting the ISO the relief it seeks implicates Amendment 36 or is otherwise related to the ISO Tariff's credit requirements.

The ISO Tariff requires scheduling coordinators to maintain an "Approved Credit Rating," or alternatively, to maintain security in an amount intended to cover its outstanding and estimated liability. <u>See</u> ISO Tariff § 2.2.3.2. It is undisputed that PG&E, SCE and their scheduling coordinator no longer maintain an "Approved Credit Rating" as that term is defined in the ISO Tariff. Thus, they must post security. <u>See</u> <u>id.</u> § 2.2.7.3. Scheduling coordinators that fail to meet these requirements are prohibited from submitting a schedule to the ISO. <u>See</u> <u>id.</u> In other words, they cannot participate in the advance scheduling process. By implementing Amendment 36, the ISO relieved scheduling coordinators of this responsibility, and thus, allowed them to participate in the advance market despite their failure to maintain an approved credit rating, or alternatively, post security.

Amendment 36 applies only to purchases made in the advance market, and is irrelevant to purchases made in the real-time market, the ISO's ability to issue dispatch orders, and defendants' obligation to respond to the same. Thus, the relief the ISO seeks does not require the court to adopt, or even consider, Amendment 36 in any way.

Defendants' suggestion that this court is engaging in selective enforcement of the ISO Tariff, by entertaining the ISO's action to enforce the emergency dispatch provisions while

"overlooking" the ISO's own alleged violations of the ISO Tariff, is disingenuous. The ISO, not this court, selected its claim. This court may adjudicate only the claims properly before it. The only claim pending before this court is the claim filed by the ISO to enforce the emergency dispatch provisions of the ISO Tariff. To date, defendants have chosen not to bring an action in this court enforcing the credit requirement provisions of the ISO Tariff. Absent such an action, this court does not have the authority sua sponte to enforce the credit provisions in the ISO Tariff.

**2.    Possibility of Irreparable Harm**

The State of California is confronting an energy crisis of catastrophic proportions. On January 17, 2001, Governor Gray Davis proclaimed a State of Emergency in response to California's energy crisis. In recent weeks, the ISO has declared a series of "Stage 3" Emergencies. Stage 3 Emergencies are declared only when electricity operating reserves fall below (or are expected to fall below within the next two hours) a margin of 1 to 1-1/2 percent.

Moreover, at the February 7, 2001 hearing, James Detmers, the Managing Director of Operations for the ISO, testified that the ISO has been forced to rely on the real-time market for a considerable period of time. According to Mr. Detmers, the shortfalls in power vary from 2,000 - 3,000 megawatts to 8,000 - 10,000 megawatts. A Stage 3 Emergency occurs when the under-arranged amount ranges from 7,000 - 8,000 megawatts.

Reliant controls approximately 3,800 megawatts of generating capacity in California. Dynegy has approximately 2,000 megawatts

1  of capacity.  AES has approximately 4,083 megawatts of capacity,
2  and Williams markets AES' output.  While the precise amount of
3  electricity available from defendants to respond to emergency
4  dispatch orders is uncertain and in dispute, it is nevertheless
5  significant, and its loss poses an imminent threat of blackouts.
6  The parties do not dispute that such blackouts pose a dire threat
7  to public health and safety.  See Mississippi Power & Light v.
8  United Gas Pipe Line Co., 760 F.2d 618, 623 (5th Cir. 1985)
9  (injury to public may suffice as irreparable harm in private
10 action); see also Northern Indiana Pub. Serv. Co. v. Carbon
11 County Coal Co., 799 F.2d 265, 280 (7th Cir. 1986) (injury to
12 public may suffice as irreparable harm where public is
13 essentially real party in interest).

14    Defendants contend that any potential for irreparable harm
15 may be cured by the California Department of Water Resources
16 ("DWR"), which recently has been appropriated significant funds
17 with which to purchase electricity.  See California Assembly Bill
18 1x  (approved by Governor Feb. 1, 2001; filed with Sec'y of State
19 Feb. 1, 2001); Senate Bill 7x (approved by Governor Jan. 19,
20 2001; filed with Sec'y of State Jan. 19, 2001).  Defendants
21 represent that they are more than willing to sell power to a
22 creditworthy buyer such as DWR.

23    DWR, however, is not a party to this lawsuit, and therefore,
24 is not subject to this court's jurisdiction.  Moreover, the
25 parties have proffered no evidence demonstrating that the ISO has
26 any control over the purchasing activities of DWR.  While DWR
27 acknowledges that it has been given authority to make power
28 purchases on behalf of the State of California, it represents

that it does not and cannot guarantee payment for power obtained pursuant to dispatch orders. Rather, DWR's participation in the real-time market is limited to bid purchases. Accordingly, based upon the evidence presented thus far, the court is not satisfied that DWR can or will avert the potential for irreparable harm to the public.

**CONCLUSION**

Accordingly, IT IS ORDERED THAT:

1. Pending hearing and determination of the Order to Show Cause Re: Issuance of Preliminary Injunction, defendants and their agents, servants, employees and successors SHALL comply with all provisions of the ISO Tariff.[6]

2. The parties to this action SHALL appear before this court on Friday, February 16, 2001 at 2:00 p.m. to SHOW CAUSE why a preliminary injunction should not issue.

3. Defendants may file and serve any additional briefing and evidence no later than Monday, February 12, 2001.

4. Plaintiff may file and serve a responsive brief and evidence no later than Wednesday, February 14, 2001. Service of these papers shall be made personally upon counsel for the parties or as arranged by the parties.

///

---

[6] For those defendants concerned that compliance with this Temporary Restraining Order may cause them to run afoul of state or federal laws, the court notes that its Order only requires that defendants comply with the provisions of the ISO Tariff. As counsel for AES noted at the February 7, 2001 hearing, the ISO Tariff exempts generators from complying with dispatch orders where such compliance will result in a violation of state or federal law which cannot be waived. See ISO Tariff § 5.6.3.2(b).

11

5. The bonding requirement under Fed. R. Civ. P. 65(c) is waived, as the ISO, a not-for-profit public benefit corporation, is unable to post a substantial bond. See <u>People of State of California ex rel. Van de Kamp v. Tahoe Regional Planning Agency</u>, 766 F.2d 1319, 1325 (9th Cir. 1985).

IT IS SO ORDERED.

DATED: February 8, 2001.

*/s/ Frank C. Damrell*
FRANK C. DAMRELL, Jr.
UNITED STATES DISTRICT JUDGE

```
                    United States District Court
                              for the
                    Eastern District of California
                          February 9, 2001
```

```
                    * * CERTIFICATE OF SERVICE * *


                                              2:01-cv-00238
```

CA Independent

   v.

Reliant Energy Svc

---

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Eastern District of California.

That on February 9, 2001, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office, or, pursuant to prior authorization by counsel, via facsimile.

```
     Norma G Formanek                          MP/FCD
     NOT EDCA ADMITTED
     Farella Braun and Martel
     235 Montgomery Street
     Suite 3000
     San Francisco, CA  94104

     Terry James Houlihan
     McCutchen Doyle Brown and Enersen
     Three Embarcadero Center
     San Francisco, CA  94111-4066

     Hiren Madhubhai Patel
     Attorney General's Office of the State of California
     PO Box 944255
     1300 I Street
     Suite 125
     Sacramento, CA  94244-2550
```

```
                                   Jack L. Wagner, Clerk

                               BY: _____
```