UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

CALIFORNIA INDEPENDENT
SYSTEM OPERATOR CORPORATION,

                            NO. CIV. S-01-238 FCD/JFM

      Plaintiff,

   v.                       ORDER GRANTING PRELIMINARY
                               INJUNCTION
RELIANT ENERGY SERVICES,
INC., et al.,

      Defendants.

----oo0oo----

This lawsuit concerns the obligation of certain generators to respond to emergency dispatch instructions[1] for electric power issued by plaintiff California Independent System Operator Corporation ("the ISO").[2]  This matter is

---

[1] The term "emergency dispatch instruction" is synonymous with "emergency dispatch order."  The court uses the term "instruction" herein because that is term used in the ISO Tariff, and by the Federal Energy Regulatory Commission ("FERC").

[2] Defendants include Reliant Energy Services, Inc., Reliant Energy Ormand Beach LLC, Reliant Energy Mandalay, LLC, Reliant Energy Etiwanda, LLC, Reliant Energy Coolwater, LLC, and Reliant Energy Ellwood, LLC (collectively referred to herein as "Reliant"), Williams Energy Marketing & Trading

1

1  before the court on the following motions: (1) the ISO's

2  motion for preliminary injunction requiring Reliant to respond

3  to emergency dispatch instructions issued by the ISO;[3] (2)

4  Reliant's motion to dismiss the action for lack of

5  jurisdiction, or alternatively, to stay the action under the

6  doctrine of primary jurisdiction; and (3) the California

7  Department of Water Resources' ("DWR") motion to dismiss the

8  third-party complaint filed against it by Reliant on Eleventh

9  Amendment immunity grounds.  By this order, the court now

10  rules on the pending motions

11  **BACKGROUND**

12  **1.  California's Electric Power Market**

13      The ISO is responsible for controlling and maintaining

14  California's electric power transmission grid.  As part of its

15  responsibilities, the ISO acts as a power "broker" between the

16  generators and utilities.  These transactions are governed by

17  the ISO Tariff.[4]

18      California's electric power market is comprised of two

19  sub-markets: the "advance market" and the "real time market."

20  In the advance market, the ISO accepts and coordinates power

21

22  Company ("Williams"), AES Placerita Inc., AES Alamitos, LLC,
   AES Huntington Beach, LLC, AES Redondo Beach, LLC
23  (collectively "AES"), and Dynegy Power Corporation ("Dynegy").

24

25      [3] As discussed below, all defendants except Reliant have
   entered into a stipulation with the ISO which moots, at least
26  temporarily, the ISO's pending motion for preliminary
   injunction as to those defendants.

27      [4] The ISO Tariff was filed with and approved by the
   Federal Energy Regulatory Commission pursuant to Section 205
28  of the Federal Power Act, 16 U.S.C. § 824d.

2

1   "schedules" submitted by utilities that qualify as "scheduling

2   coordinators."  These schedules represent advance statements

3   of the quantities of electricity the scheduling coordinator

4   anticipates its customers will consume the day after the

5   schedule is submitted, together with quantities of electric

6   generation that the scheduling coordinator anticipates having

7   available the next day to meet those projected demands.  This

8   process is repeated an hour before actual operations, to give

9   the utilities a chance to make adjustments to their schedules

10  to account for changes in weather, the status of generating

11  units and other factors.  See ISO Tariff §§ 2.2.3, 2.2.11 -

12  2.2.13.

13      Even with the opportunity for hour-ahead adjustments,

14  actual customer demand for electricity and actual output of

15  generating units may differ from the demands and operating

16  levels reflected in the utilities' schedules.  The ISO is

17  responsible for ensuring that unscheduled demands for

18  electricity in real time operations are matched by additional

19  electricity from generating units.  If customer demand is not

20  met by scheduled supplies in the advance market, the ISO must

21  procure additional electricity to maintain the reliability of

22  the transmission grid and serve customer demand.  To meet

23  unscheduled demands, the ISO accepts bids from generators to

24  supply electricity in real time.  The bid portion of the real

25  time market is referred to as the "imbalance market."  When

26  the amount of electricity available to the ISO in the

27  imbalance market is insufficient, the ISO issues emergency

28  dispatch instructions to its participating generators which

1   are obligated, under the ISO Tariff, to supply power when
2   called upon by the ISO to avert outages.  <u>See</u> <u>id.</u> § 5.1.3.  If
3   the ISO is unable to obtain sufficient power through the
4   issuance of emergency dispatch instructions, it must order
5   rolling blackouts in order to avoid a system-wide "crash" of
6   the transmission grid.  The obligation of generators to
7   respond to emergency dispatch instructions is the subject of
8   this action.

9   **2.   The California Power Crisis**

10        On January 17, 2001, Governor Gray Davis proclaimed a
11  State of Emergency in response to California's energy crisis.
12  In January and February 2001, the ISO declared a series of
13  "Stage 3" Emergencies.  <u>See</u> Ex. A to Stout Decl., filed Mar.
14  15, 2001.  Stage 3 Emergencies are declared only when
15  electricity operating reserves fall below (or are expected to
16  fall below within the next two hours) a margin of 1 to 1-1/2
17  percent.

18        The serious financial problems of California's investor-
19  owned utilities, Pacific Gas & Electric ("PG&E") and Southern
20  California Edison ("SCE"), have contributed significantly to
21  the crisis.[5]  As a result of these problems, many power
22  generators, including Reliant, have not been paid for a
23  significant portion of the electricity they have supplied, and
24  are reluctant to continue selling electricity to the utilities

25  ────────────

26        [5] PG&E and SCE have incurred enormous debts buying
    wholesale power at prices that exceed the prices they can
27  charge their customers.  PG&E and SCE have defaulted on
    various debts, precipitating financial uncertainty throughout
28  the industry.

4

1   (via the ISO) in the absence of assurances they will be paid.

2      To ensure the continued flow of electricity, on December

3   14, 2000, the then-Secretary of the United States Department

4   of Energy stepped in and ordered a host of power generators,

5   including Reliant, "to make arrangements to generate, deliver,

6   interchange, and transmit electric energy when, as, and in

7   such amounts as may be requested by the [ISO]."[6]  Amendment 2

8   to Jan. 11, 2001 Ord., dated Jan. 23, 2001, attached as Ex. D

9   to Verified Compl., filed Feb. 6, 2001.  In anticipation of

10  the expiration of that order, on February 7, 2001, the ISO

11  sent a letter to generators operating in its market pursuant

12  to the ISO Tariff, requesting assurances that the generators

13  would continue to comply with any and all emergency dispatch

14  instructions issued by the ISO notwithstanding the financial

15  problems described above, and in the absence of any assurances

16  that they would be fully compensated for power supplied

17  pursuant thereto, or for power previously supplied.[7]

18  ───────────────

19      [6] The order was subsequently extended by the current
    Secretary of the United States Department of Energy.

20      [7] The letter stated in pertinent part:

21      As you are probably aware, recent Securities and
        Exchange Commission filings by [the California
22      utilities] indicate that the ISO may not be paid in
        full when settlement payments fall due on February
23      2, 2001.  In that event, the ISO will make only pro
        rata payments to suppliers for these services as
24      provided in the Tariff.  Despite these
        circumstances, the ISO is committed to carrying out
25      its mission of ensuring reliable, continuing service
        to California consumers and so asks for your
26      commitment to comply with any and all dispatch
        instructions to units covered by the PGA.

27  Jan. 31, 2001 letter, attached as Ex. I to Verified Compl.,
28  filed Feb. 6, 2001.

1  Defendants' failure to provide adequate assurances in this

2  regard prompted the instant action.[8]

3  / / /

4  **3.   Current Market Share Of Emergency Dispatch Instructions**

5       As outlined above, the ISO issues emergency dispatch

6  instructions when (1) customer demand in the real time market

7  is not met by scheduled supplies in the advance market, and

8  (2) the is unable to make up the shortfall through bids from

9  generators to supply power in real time.   In recent months,

10 the real time market has constituted approximately 25% of the

11 entire market.   See Detmers Decl., filed Mar. 20, 2001, ¶ 8,

12 and Ex. E attached thereto.   Emergency dispatch instructions

13 have constituted approximately 50% of the real time market.

14 Id.   Thus, in recent months, emergency dispatch instructions

15 have accounted for roughly 12.5% of all power supplied through

16 the grid.   Id.

17 **4.   DWR's Entry Into The Market**

18      Earlier this year, DWR was appropriated significant funds

19 with which to purchase electricity,[9] and has entered into a

20 number of long-term contracts with generators.   As discussed

21 below, last month DWR entered into a short term agreement with

22

23      [8] It should be noted that AES does not take issue, at
   least in the present litigation, with the creditworthiness
   issue, but rather, with its obligation to respond to emergency

24 dispatch instructions where such response would violate state
   and/or federal environmental laws.   The court addressed this

25 issue in its temporary restraining order.   See TRO, filed Feb.
   8, 2001, at 11 n.6.

26

27      [9] See California Assembly Bill 1x  (approved by Governor
   Feb. 1, 2001; filed with Sec'y of State Feb. 1, 2001); Senate

28 Bill 7x (approved by Governor Jan. 19, 2001; filed with Sec'y
   of State Jan. 19, 2001).

Reliant in which it agreed to pay for power provided pursuant
to emergency dispatch instructions.

**5.   The Instant Litigation**

The ISO filed this action, along with an application for
temporary restraining order, on the morning of February 6,
2001.
Reliant immediately filed a motion to dismiss the action for
lack of jurisdiction.  The court heard the ISO's application
for temporary restraining order later that day, and granted
the application as to Reliant, ordering Reliant to continue to
sell electricity to the utilities via the ISO and to continue
to respond to emergency dispatch instructions.[10]  The order was
to remain in effect pending a further hearing on the matter on
February 7, 2001 at 3:00 p.m.  The remaining defendants
stipulated that they would continue to respond to emergency
dispatch instructions until the conclusion of that hearing,
and thus, were not subject to the court's temporary
restraining order.

At the February 7, 2001 hearing, the court denied
Reliant's motion to dismiss and extended the temporary
restraining order against Reliant until 5:00 p.m. (PST) on
February 8, 2001, pending issuance of a written order.  The
remaining defendants again stipulated that they would continue
to abide by the provisions of the ISO Tariff, and would
continue to respond to emergency dispatch instructions, until

---

[10] The court also granted the motion of the State of
California *ex rel* Electricity Oversight Board ("EOB") to
intervene in this action at the February 6, 2001 hearing.

1   that time.  See Feb. 7, 2001 Hr'g Trans. at 100-01.  The court

2   further ordered defendants to appear on February 16, 2001 to

3   show cause why a preliminary injunction should not issue.  In

4   its written order filed February 8, 2001, the court enjoined

5   all defendants, requiring them to comply with the terms of the

6   ISO Tariff and to continue to respond to emergency dispatch

7   instructions pending the February 16, 2001 hearing and

8   disposition of the order to show cause.  See TRO at 11.

9   / / /

10      On February 12, 2001, Reliant filed an application for a

11  temporary restraining order against the ISO, a motion to join

12  DWR as a party, and a third-party complaint against DWR.  On

13  February 14, 2001, DWR filed a motion to dismiss the third-

14  party complaint on Eleventh Amendment immunity grounds.[11]  On

15  February 15, 2001, Reliant filed a second motion to dismiss

16  for lack of jurisdiction, or alternatively, to stay based on

17  the doctrine of primary jurisdiction.  These motions, as well

18  as Reliant's application for a temporary restraining order,

19  were set for hearing on February 16, 2001, along with the

20  ISO's motion for preliminary injunction.

21      At the February 16, 2001 hearing, Reliant withdrew its

22  motion for temporary restraining order.  See Feb. 16, 2000

23  Hr'g Trans. at 68, 83.  At the close of the hearing, the court

24  took the remaining matters under submission, and stated its

25  intent to issue a written order not later than Wednesday,

26

27      [11] The parties agreed that DWR's opposition to Reliant's
    motion to join DWR as a party was properly treated as a motion
    to dismiss the third-party complaint.  See Feb. 16, 2001 Hr'g
28  Trans. at 67-68.

1  February 21, 2001 at 5:00 p.m.  The court also extended the

2  temporary restraining order to 5:00 p.m. on February 21, 2001.

3  Id. at 112-14.

4       During the course of the February 16 hearing, at side

5  bar, the court was informed by counsel for Dynegy and Reliant

6  that those defendants had entered into agreement with DWR,

7  which, according to the same counsel, obviated the need to

8  rule on the pending motions.  Those agreements, however, were

9  not available at the close of the hearing, and were not made

10 available to opposing counsel or the court until Monday,

11 February 19, 2001 (Reliant-DWR agreement) and Tuesday,

12 February 20, 2001 (Dynegy-DWR agreement).[12]

13      On February 21, this court held a telephonic status

14 conference in camera to discuss the effect of those agreements

15 filed under seal on the pending motions and litigation.  Based

16 on the terms of those confidential agreements and the

17 representations of counsel, it appeared the parties might

18 enter into a stipulation which would temporarily moot the

19 pending motions.  Accordingly, at the request of the parties,

20 the court set the matter for a telephonic status conference in

21 camera on February 23, 2001 at 2:00 p.m. to allow the parties

22 sufficient time to enter into such a stipulation, and extended

23 the temporary restraining order to 5:00 p.m., Friday, February

24 23, 2001.  See Order Extending TRO, filed Feb. 21, 2001.[13]

25

26      [12] Those agreements were filed under seal.

27      [13] Because the telephonic status conference would
   necessarily involve a discussion of the contents of the
28 confidential agreements between defendants and DWR, which were

9

On February 23, the ISO, Reliant, Dynegy and Williams submitted a stipulation and proposed order pursuant to which those defendants agreed to comply with emergency dispatch instructions until 5:00 p.m. on March 19, 2001.[14]  At the February 23 status conference, the ISO and AES also entered into a stipulation pursuant to which AES agreed to comply with emergency dispatch instructions.  A further status conference was set for March 16, 2001.  The temporary restraining order expired at 5:00 p.m. on February 23, 2001.

On March 9, 2001, the parties filed a joint status conference statement and advised the court that Dynegy had orally agreed to extend the February 23, 2001 stipulation pending a ruling by the FERC on an "emergency request" filed with the FERC on February 22, 2001,[15] and that Williams was willing to do the same.  With respect to the remaining defendants, the parties essentially agreed that the pending motions were properly deemed submitted.

At approximately 4:00 p.m. on Thursday, March 15, 2001, the court received Reliant's supplemental opposition to the ISO's motion for preliminary injunction.  Two supplemental supporting declarations containing extensive exhibits were received approximately one hour earlier.  These supplemental

filed under seal, the court, at the request of the parties, again ordered that the telephonic status conference take place in camera.

[14] The stipulation and order also provided for termination by any party on two-days notice.

[15] The substance of this request is discussed below in connection with Reliant's motion to stay.

1  documents were submitted without the court's permission.

2  However, at the March 16, 2001 status conference, the ISO and

3  the EOB were granted permission to file supplemental replies

4  not later than March 20, 2001.

5       At the March 16, 2001 status conference, Dynegy, Williams

6  and AES stipulated on the record that they would continue the

7  February 23 stipulations until the FERC ruled on the February

8  22 emergency request.  See Mar. 16, 2001 Hr'g Trans. at 5-7.

9  The ISO accepted their stipulation, and agreed that its motion

10  for a preliminary injunction was mooted, at least temporarily,

11  as to those defendants.  See id. at 6-7.  Reliant would not

12  enter into a similar stipulation.  Reliant did, however, agree

13  to stipulate to respond to emergency dispatch instructions

14  until 5:00 p.m. Wednesday, March 21, 2001, to allow the ISO

15  and the EOB an opportunity to respond to its supplemental

16  brief.  See id. at 29-30.

17       The court has received and reviewed the ISO's and the

18  EOB's supplemental replies, the ISO's objection to the

19  Declarations of Thomas Hixson and exhibits attached thereto,

20  and the extensive briefing submitted by all parties in

21  connection with the ISO's motion for preliminary injunction,

22  Reliant's motion to dismiss, and DWR's motion to dismiss

23  Reliant's third-party complaint.  The court has also given

24  careful consideration to the arguments and testimony presented

25  at the hearings on these matters.  For the reasons set forth

26  below, Reliant's motion to dismiss or stay is denied, DWR's

27  motion to dismiss is granted, and the ISO's motion for a

28  preliminary injunction is granted subject to the limitations

1   set forth below.

2                              **ANALYSIS**

3   **1.   Reliant's Motion To Dismiss Or Stay**

4        On February 15, 2001, Reliant filed a motion to dismiss

5   or stay based of the FERC's February 14, 2001 order.  Reliant

6   moved this court to dismiss the underlying action in its

7   entirety for lack of jurisdiction and failure to state a claim

8   on which relief can be granted, or alternatively, to stay the

9   action under the primary jurisdiction doctrine.

10       **A.   Motion to Dismiss**

11       Reliant's motion to dismiss hinges on its interpretation

12  of the FERC's February 14, 2001 order as finding that "the

13  credit provisions of the Tariff *do* apply to real time

14  transactions."  Reliant's Mem. of P. & A. in Support, filed

15  Feb. 15, 2001, at 2 (emphasis in original).  Reliant's

16  interpretation finds little, if any, support in the FERC's

17  order.  Before addressing the merits of Reliant's argument,

18  some background information concerning the FERC's order is

19  required.

20       On February 14, 2001, the FERC issued an "Order

21  Addressing Creditworthiness Tariff Provisions Proposed By the

22  California Independent System Operator And California Power

23  Exchange."  See FERC Ord., filed Feb. 14, 2001, attached as

24  Ex. A to Reliant's Mot. to Dismiss, filed Feb. 15, 2001 ("FERC

25  Ord.").  That order was issued, in part, in response to

26  proposed Amendment No. 36 filed by the ISO on January 4, 2001

27  "to revise the Approved Credit Rating requirements of the

28  [ISO] tariff."  FERC Ord. at 2.  Proposed Amendment No. 36

                                 12

"gives the ISO temporary authority to waive the requirement that UDCs[16] without an Approved Credit Rating post security." Id. At the time it filed Amendment No. 36, the ISO announced that it would implement it immediately, and requested that the FERC approve it nunc pro tunc to January 4, 2001.

As discussed below in connection with the ISO's motion for preliminary injunction, without Amendment No. 36, the ISO Tariff requires scheduling coordinators to maintain an "Approved Credit Rating," or alternatively, to post security. See ISO Tariff § 2.2.3.2.  Scheduling coordinators that fail to obey these requirements are prohibited from submitting schedules to the ISO.  See id. § 2.2.7.3.

In its February 14 order, the FERC "conditionally accept[ed] Amendment No. 36 . . . for filing to become effective January 4, 2001, subject to clarification and guidance provided below . . . ."  More specifically, the FERC "accept[ed] the amendments to the extent they allow PG&E and SoCal Edison to continue to schedule transactions from generation and over transmission they own to serve their own load," and "den[ied] the amendments to the extent they allow PG&E and SoCal Edison to continue to schedule transactions from third-party suppliers without adequate assurance of payment."  Id. at 1-2. According to the FERC, those "actions should help in maintaining the reliability of system operations and in encouraging the entry of lower-cost supply into California

---

[16] "UDC" stands for investor-owned utility distribution company.  PG&E and SCE are both UDCs.

13

markets."  Id. at 2.

Reliant interprets the FERC order to hold that the creditworthiness provisions of the ISO Tariff apply to all real time transactions, including emergency dispatch instructions.  They plainly do not.  In its order, the FERC recognizes that the tariff's creditworthy requirements apply to the *scheduled* delivery of electric power.[17]  As discussed above and in the court's temporary restraining order, power is "scheduled" in the advance market, not the real time market."[18]

The FERC order's conclusion supports this interpretation:

> Under our order, the ISO can continue to accept the UDCs' schedules to supply their load with their own resources, and DWR's authority to purchase on behalf of the UDCs is acceptable.  Thus, *the unresolved creditworthiness issues relate to the UDCs residual load that is served through the ISO's imbalance market.*  Under current conditions, there is a bid insufficiency in the ISO's imbalance energy market causing the ISO to issue emergency dispatch

---

[17] See FERC Ord. at 1-2; see also id. at 10 ("The creditworthiness requirements in the ISO tariff apply not only when a UDC is *scheduling* delivery of power purchased from a third party, but also when a UDC or its Scheduling Coordinator is scheduling its own generation and using its own transmission resources that are now controlled by the ISO.") (emphasis added); id. at 12 (rejecting application of Amendment No. 36 "beyond the UDCs and their Scheduling Coordinators *self-scheduling* their own generation and accessing their own transmission facilities.") (emphasis added).

[18] The FERC order was filed after the court's temporary restraining order.  In the temporary restraining order, the court agreed that enforcement of Amendment 36 would require the court to modify and/or amend the ISO Tariff, and thus would fall outside of its jurisdiction.  See TRO at 7.  The court disagreed, however, that granting the ISO the relief it seeks implicated Amendment 36 or was otherwise related to the ISO Tariff's credit requirements, as the court construed Amendment 36 to pertain solely to purchases made in the advance market.  Id. at 8.

instructions in order to meet this residual load and balance the system.  By maintaining appropriate creditworthy standards that ensure payment for services by a creditworthy counterparty such as DWR, this order should increase the supply in the energy imbalance market and reduce the need for emergency dispatch instructions.

Id. at 13 (emphasis added).  Here, the FERC expressly notes that the creditworthiness issue is unresolved as to the imbalance market.  As the order indicates, the imbalance market is the market that precedes the issuance of emergency dispatch instructions.  If the creditworthiness issue is unresolved as to that market, the order cannot reasonably be construed as resolving the issue as to power supplied in response to emergency dispatch instructions.  Moreover, the FERC concludes that by enforcing credit requirements in the scheduled markets, its order "should . . . reduce the need for emergency dispatch instructions."  Id.

/ / /

In addition to proposed Amendment No. 36, the FERC also purported to "act on various requests for clarification on creditworthiness issues."  Id. at 1.  Among other things, Dynegy sought "clarification that the ISO tariff penalties for failure to comply with emergency dispatch instructions do not apply when purchasers fail to meet the tariff creditworthiness requirements."  Id. at 4.  While FERC initially purports to address the creditworthiness aspects of Dynegy's request, it later states that it will address "the penalty provision for which Dynegy seeks clarification," in a later order.  See id. at 4, 12-13.  Thus, it would appear that the FERC specifically reserved comment on the issue of whether the ISO Tariff's

creditworthiness provisions apply to electricity provided in response to emergency dispatch instructions.

Indeed, had the FERC decided the issue, there would have been nothing left to "address" concerning Dynegy's request for clarification of the applicability of penalties for refusing to respond to emergency dispatch instructions, and the FERC would not have deferred action on the request as it appears to have done.

Because the FERC did not decide that the ISO Tariff's creditworthiness provisions apply to the real time market, the FERC's February 14 order does not moot this action.  Nor does the relief the ISO seeks, namely compliance with emergency dispatch instructions, conflict with the FERC's February 14 order.  Based on the above, the court rejects Reliant's assertion that the FERC "recognized" that the ISO Tariff's creditworthiness provisions apply to purchases in the real time market.[19]

_____

[19] The court also rejects Reliant's assertion that more recent FERC actions "confirm that this court lacks jurisdiction." See Supp. Opp'n at 4, filed Mar. 15, 2001. Reliant attempts to characterize this case as a dispute over the just and reasonable price of power, a matter it contends the FERC resolved in its March 9, 2001 order.  The issue before this court is whether Reliant is obligated to respond to emergency dispatch instructions, and more particularly, whether the ISO Tariff's creditworthiness provisions apply to power provided in response to emergency dispatch instructions. That issue was not addressed by the FERC's March 9, 2001 order or any other FERC order.  As set forth above, that issue is currently pending before the FERC.  Reliant's arguments concerning DWR's ability and/or obligation to ameliorate any threat of irreparable harm are addressed below in connection with the ISO's motion for preliminary injunction.

Reliant's reliance on the FERC's March 2001 Staff Report is wholly misplaced.  See Ex. B to Hixson Decl. in Supp. of Supp. Opp'n, filed Mar. 15, 2001, is wholly misplaced.  As stated on the cover of the report, the recommendations

1    Accordingly, Reliant's motion to dismiss is denied.

2    **B.    Motion to Stay**

3        Should the court deny its motion to dismiss, Reliant

4    alternatively argues that the court should stay the case,

5    under the primary jurisdiction doctrine, until the FERC rules

6    on the issue of whether the ISO Tariff's creditworthiness

7    provisions apply to electricity provided in response to

8    emergency dispatch instructions.

9        The ISO is entitled to bring an action for emergency

10   injunctive relief to enforce the ISO Tariff, and this court

11   has jurisdiction over such an action.  <u>See</u> 16 U.S.C. § 825p.

12   Under the primary jurisdiction doctrine, the court, in its

13   discretion, may stay the action if its resolution concerns

14   matters that are within the special expertise of an

15   administrative agency.  <u>See</u> <u>Chabner v. United of Omaha Ins.</u>

16   <u>Co.</u>, 225 F.3d 1042, 1051 (9th Cir. 2000); <u>Farley Transp. Co.</u>

17   <u>v. Santa Fe Trail Transp. Co.</u>, 778 F.2d 1365, 1370 (9th Cir.

18   1985).  There is no "fixed formula" for applying this

19   doctrine, and each case must be assessed on its particular

20   facts.  <u>Chabner</u>, 225 F.3d at 1051; <u>Farley</u>, 778 F.2d at 1370.

21

22   contained therein are those of the *staff*, and "do not
     necessarily reflect the views of the Commission or any of its
23   Commissioners."  Reliant notes that the report recommends that
     "generators should be required to offer all their capacity to
24   the ISO" during a Stage 3 Emergency, and argues that if
     generators were already so obligated, there would be no need
25   for the recommendation.  As the court noted at the March 16,
     2001 hearing, the report also recommends that during a Stage 3
26   Emergency, generators should receive payment at no less than
     marginal cost.  If the generators were already guaranteed
27   payment for such power, as Reliant contends, there would
     likewise be no need for that recommendation.  Accordingly, the
28   staff report does not advance the analysis of the issues
     before the court.

1      Clearly, the FERC is an agency with special expertise
2  concerning the ISO Tariff.  Absent the extreme exigencies of
3  the California power crisis, the court agrees that a stay
4  pending further action by the FERC would be proper, if not
5  routine.  But those are not the facts here.  Electricity is in
6  critically short supply.  Rolling blackouts are a reality.
7  The health and safety of the people of California are
8  potentially at risk.  In light of such imminent irreparable
9  harm, the court declines to stay this action in its entirety.

10      At the February 16, 2001 hearing, defendants assured this
11  court that while the FERC cannot grant injunctive relief, it
12  will act quickly when necessary.  Despite the FERC's express
13  statement in its February 14 order that it would address the
14  applicability of the creditworthiness provisions to emergency
15  dispatch instructions in a future order, on February 22, 2001,
16  several California generators, including Reliant, filed with
17  the FERC a "Request [] For Emergency Order To Compel The
18  California Independent System Operator Corporation To Comply
19  With The Commission's February 14, 2001 Order."  See Ex. A to
20  Joint Status Report, filed Mar. 9, 2001.  In that emergency
21  request, the generators sought an expedited order requiring
22  the ISO "to comply immediately with the plain terms of the
23  Commission's February 14 order on creditworthiness issues,"
24  including enforcing the ISO Tariff's creditworthiness
25  provisions on purchases made in the real time market.  See
26  Req. at 1-2.  Despite the generators' allegation that the ISO
27  has "repudiated" the "clear directives" of the FERC's February
28  14 order and the extreme urgency of the request, this matter

18

1  has been pending before the FERC for a month.[20]  This is by no

2  means a criticism of the FERC.  Rather, it simply demonstrates

3  that a stay of this entire action may well deny the ISO's

4  ability to avert potentially imminent and irreparable harm to

5  the people of California.  Accordingly, Reliant's motion to

6  stay this action in its entirety is denied.

7      Notwithstanding the above, the fact remains that the

8  critical issue in this case, namely whether the ISO Tariff's

9  creditworthiness provisions apply to electricity provided in

10  response to emergency dispatch instructions, is pending before

11  the FERC.  Accordingly, the court preliminarily enjoins

12  Reliant until the FERC rules on this issue.

13  **2.   DWR's Motion to Dismiss Reliant's Third-Party Complaint**

14      DWR moves to dismiss Reliant's third-party complaint on

15  the ground that it is a state agency, and thus immune from

16  suit under the Eleventh Amendment.  Reliant opposes the

17  motion, arguing that the State of California (and thus, DWR)

18  has waived its immunity in this case.

19      The Eleventh Amendment prevents states from being sued by

20  citizens in federal court without the state's consent.  <u>See</u>

21  <u>Papasan v. Allain</u>, 478 U.S. 265, 276 (1986); <u>Pennhurst State</u>

22  <u>School & Hosp. v. Halderman</u>, 465 U.S. 89, 100 (1984).  "[T]he

23  Eleventh Amendment's bar currently applies to all suits

24  brought by an individual against an unconsenting state,

25

26      [20] Since issuing its February 14, 2001 order, the FERC has
     issued three orders concerning the practices of generators in
27  California, but has chosen not to address the application of
     the creditworthiness requirements to emergency dispatch
28  orders.

regardless of the basis of jurisdiction or the citizenship of
the plaintiff, assuming that Congress has not abrogated the
states' immunity pursuant to legislation passed with the
requisite constitutional power."  13 Wright & Miller, <u>Federal</u>
<u>Practice and Procedure</u> § 3524 (Supp. 2000).  Thus, arms of the
state such as DWR are "presumptively entitled to Eleventh
Amendment immunity."  <u>See</u> <u>Watkins v. Calif. Dept. of</u>
<u>Corrections</u>, 100 F.Supp.2d 1227, 1229 (C.D. Cal. 2000).

In some circumstances, however, a state can waive its
Eleventh Amendment immunity.  The test for determining whether
such a waiver has occurred "is a stringent one."  <u>See</u> <u>College</u>
<u>Savings Bank v. Florida Prepaid Postsecondary Educ. Expense</u>
<u>Bd.</u>, 527 U.S. 666, 119 S.Ct. 2219, 2226 (1999).  "In deciding
whether a State has waived its constitutional protection under
the Eleventh Amendment, we will find waiver only where stated
'by the most express language or by such overwhelming
implications from the text as (will) leave no room for any
other reasonable construction.'"  <u>Edelman v. Jordan</u>, 415 U.S.
651, 673 (1974) (citation omitted).

/ / /

The Supreme Court has identified two circumstances in
which a state, by its own actions,[21] may be found to have
waived its Eleventh Amendment immunity.  First, waiver occurs
when a state voluntarily invokes the jurisdiction of the

---

[21] Waiver may also be found where Congress has validly
abrogated state immunity by creating private causes of action
against the states to redress violations of the Fourteenth
Amendment.  <u>See</u>, <u>e.g.</u>, <u>Fitzpatrick v. Bitzer</u>, 427 U.S. 445
(1976).  This type of waiver is not at issue here.

1    court, for instance, by filing an action in federal court.

2    See College Savings Bank, 119 S.Ct. at 2226 (citing Gunter v.

3    Atlantic Coast Line R. Co., 200 U.S. 273, 284 (1906)).

4         Second, waiver may be found where the state makes a

5    "clear declaration" of its intention to submit itself to the

6    jurisdiction of a federal court.  See id. (citing Great

7    Northern Life Ins. Co. v. Read, 322 U.S. 47, 54 (1944)).  For

8    example, a state's extensive participation in pre-trial

9    activities during the pendency of a lawsuit can result in such

10   a waiver.  See Hill v. Blind Indus. & Servs. Of Md., 179 F.3d

11   754, 762 (9th Cir. 1999).

12        Waiver may not be constructive or implied.  See College

13   Savings Bank, 119 S.Ct. at 2229 (expressly overruling the

14   theory of "constructive waiver" set forth in Parden v.

15   Terminal R. of Ala. Docks Dept., 377 U.S. 184 (1964)).  For

16   instance, a state's participation in federally-regulated

17   conduct does NOT constitute a waiver of Eleventh Amendment

18   immunity from suit in federal courts.  See id. (immaterial

19   that state's conduct undertaken for profit and resembles

20   behavior of private parties).

21   / / /

22        Reliant raises two theories in support of its waiver

23   argument.  These theories shall be addressed in turn.

24        **A.   The Meter Service Agreement**

25        Reliant argues that DWR has expressly waived its Eleventh

26   Amendment immunity by contractually consenting to suit in

27   federal court.  Specifically, Reliant points to a "Meter

28   Service Agreement for Scheduling Coordinators" entered into

1   between DWR and the ISO in 1998 (hereinafter "MSA").   <u>See</u>

2   Houlihan Decl., filed February 21, 2001, Ex. A.   This MSA,

3   Reliant argues, contains terms allowing suit in federal court,

4   and thus, effectuates a waiver of Eleventh Amendment

5   immunity.[22]

6        DWR disagrees that it has waived its immunity, stating

7   that the MSA was entered into long before the passage of AB1x,

8   and was the result of DWR's management of its own load and

9   hydroelectric resources.   Thus, DWR argues, even assuming the

10  MSA effects some sort of a waiver of Eleventh Amendment

11  immunity, it does not apply to DWR's purchasing activities

12  under AB1x, and thus, does not effect a waiver with regard to

13  the claims asserted in Reliant's third-party complaint.

14       The court agrees with DWR's position.   Section 11.4 of

15  the MSA, to which Reliant refers, states that DWR and the ISO:

16       irrevocably consent[] that any legal action or
         proceeding arising under or relating to this
17       Agreement to which the ISO ADR Procedures do not

18  _____

19       [22] In support of its position, Reliant cites a single
     case, <u>In re Innes</u>, 184 F.3d 1275, 1282 (10th Cir. 1999).   In
20   <u>Innes</u>, Chapter 13 debtors brought suit against Kansas State
     University ("KSU") seeking a determination regarding the
21   dischargeability of their student loans on the theory of undue
     hardship.   KSU moved to dismiss the action on grounds of
22   Eleventh Amendment immunity.   The court denied the motion,
     holding that "KSU knowingly and voluntarily waived its
23   Eleventh Amendment immunity by agreeing, as a prerequisite to
     its participation in the Perkins Loan Program, to undertake
24   certain enumerated actions in federal bankruptcy court in the
     event of a claim for discharge filed by the student-borrower."
25   <u>See Innes</u>, 184 F.3d at 1284.   <u>Innes</u> is inapplicable here,
     because no federal funding program is involved or implicated.
26   Moreover, the <u>Innes</u> court observed that KSU's waiver would
     have been invalid had it lacked the statutory authority to do
27   so.   <u>See id.</u>   Reliant fails to point to any California
     statutes authorizing DWR to enter into contracts waiving
28   Eleventh Amendment immunity on behalf of the State of
     California.

apply shall be brought in any of the following
forums, as appropriate: any court of the State of
California, any federal court of the United States
of America located in the State of California, or,
where subject to its jurisdiction, before the
Federal Energy Regulatory Commission.

Even assuming the MSA effectuates a waiver of immunity by DWR,
such waiver would extend only to suits brought by the ISO
relating to the MSA itself.[23]  Reliant's third-party complaint
does not relate to, or allege violations of, the MSA.

Moreover, given the "stringent" test applied to determine
whether a state has waived its immunity, and the requirement
that any such waiver be found only where stated "by the most
express language or by such overwhelming implications from the
text as (will) leave no room for any other reasonable
construction," this court cannot conclude that the MSA
effectuates a general waiver of California's immunity with
respect to all matters, brought by any party, relating to the
ISO Tariff.  <u>See</u> <u>College Savings Bank</u>, 119 S.Ct. at 2226;
<u>Edelman</u>, 415 U.S. at 673.  Reliant's waiver argument regarding
the MSA is rejected.

**B.   The State of California's Conduct in This Litigation**

Reliant next argues that the State of California's
participation in this case constitutes consent by the State of
California to suit in this court, thereby waiving the state's
Eleventh Amendment immunity.  Specifically, Reliant points to

---

[23] By this order, the court does not decide whether
Section 11.4 of the MSA does, in fact, waive the State of
California's immunity with respect to claims relating to the
MSA.

1  the EOB's intervention in this lawsuit, as well as DWR's

2  "litigati[on] of this action on the merits," as evidence of

3  the State of California's waiver.  <u>See</u> Brief of Reliant, <u>et</u>

4  <u>al.</u> on Party Status of Calif. Dept. of Water Resources, filed

5  Feb. 21, 2001, at 7.  As discussed below, neither of these

6  actions effectuates a waiver.

7          *(1)  The EOB's Intervention*

8          Reliant argues that the EOB's intervention in this

9  lawsuit waives the State of California's immunity from suit

10 with respect to claims arising from the same "transaction or

11 occurrence" as the EOB's claims.  In support, Reliant cites

12 the Ninth Circuit's recent decision in <u>In re Lazar</u>, 237 F.3d

13 967 (9th Cir. 2001).  Reliant reads the <u>Lazar</u> holding far too

14 broadly.

15         In <u>Lazar</u>, the Ninth Circuit discussed the extent to which

16 a state waives its immunity by filing a proof of claim in

17 bankruptcy, as established in <u>Gardner v. New Jersey</u>, 329 U.S.

18 565 (1947), and codified at 11 U.S.C. § 106(b).  After a

19 lengthy discussion of the so-called "Rule of <u>Gardner</u>" and the

20 circumstances presented by the case, the <u>Lazar</u> court held that

21 "when a state or an 'arm of the state' files a proof of claim

22 in a bankruptcy proceeding, the state waives its Eleventh

23 Amendment immunity with regard to the bankruptcy estate's

24 claims that arise from the same transaction or occurrence as

25 the state's claim."  <u>See</u> <u>Lazar</u>, 237 F.3d at 978.

26         <u>Lazar</u> applied general rules of Eleventh Amendment

27 immunity to the unique immunity problem raised in the context

28 of a bankruptcy proceeding in which a state asserts rights to

an estate in bankruptcy, and then resists a claim filed by the estate with respect to the same *res* within the jurisdiction of the bankruptcy court.  <u>Lazar</u> clearly is distinguishable, and Reliant's attempt to apply this rule of bankruptcy law to the facts of this case is unavailing.

Stepping outside the confines of bankruptcy law, Reliant effectively attempts to circumvent DWR's Eleventh Amendment immunity by characterizing Reliant's third-party complaint as a counterclaim against the State of California, in light of the EOB's intervention.  This argument fails as well. Assuming DWR and the EOB may be treated as a single entity for purposes of this analysis, any possible waiver of immunity would be strictly limited to compulsory recoupment counterclaims.  <u>See</u> <u>United States v. Iron Mountain Mines</u>, 952 F.Supp. 673, 678-79 (E.D. Cal. 1996) (state's filing of CERCLA action did not constitute general waiver of Eleventh Amendment immunity); <u>United States v. Montrose Chem. Corp. of Calif.</u>, 788 F.Supp. 1485, 1492-93 (C.D. Cal. 1992) (Eleventh Amendment immunity waived as to compulsory recoupment counterclaims in tort by filing CERCLA action); <u>see also</u> <u>Oregon v. City of Rajneeshpuram</u>, 598 F.Supp. 1217, 1219 (D. Or. 1984) (by bringing action in federal court, state waives its Eleventh Amendment immunity with respect to all counterclaims arising out of same transaction or occurrence, "at least to the extent that the counterclaims do not exceed the amounts sought in the state's claim"); <u>Georgia Dept. of Human Resources v. Bell</u>, 528 F.Supp. 17, 26 (N.D. Ga. 1981) ("[B]y bringing suit against a private party the State waives its Eleventh Amendment immunity

and consents to the court's jurisdiction of . . .

counterclaim[s] asserted defensively, by way of recoupment,

for the purpose of defeating or diminishing the State's

recovery, but not for the purpose of obtaining an affirmative

judgment against the State.)" (citations omitted).

Here, the EOB's intervention in the ISO's lawsuit seeks injunctive relief ordering Reliant (and other generators) to comply with the emergency dispatch instruction provisions of the ISO Tariff.  No monetary damages are sought.  By contrast, Reliant's third-party complaint (which, obviously, is not a counterclaim, much less a compulsory counterclaim), seeks declaratory and injunctive relief ordering DWR to use state funds to purchase power from any and all energy markets.  See Verified Third Party Complaint, filed Feb. 12, 2001, at 8-10. Clearly, resolution of these claims in Reliant's favor would constitute an affirmative judgment against the State.  These claims also would require the payment of state funds, and do not serve merely to reduce a monetary claim, since the State of California (through the EOB) is not seeking money damages. Thus, by the EOB's intervention, the State of California cannot be said to have waived its immunity with respect to Reliant's third-party complaint.  See Bell, 528 F.Supp. at 26.

(2)  <em>DWR's Activities in this Litigation</em>

Reliant next argues that DWR's actions in this case constitute litigation on the merits, thereby waiving its immunity.  The court disagrees.  To date, DWR has (1) joined in the ISO's opposition to Reliant's motion to dismiss, (2) filed a brief and declaration supporting ISO's application for

a temporary restraining order, and (3) appeared at the TRO hearings. All of these actions occurred within the first month after the ISO filed this action. DWR's involvement to date falls far short of that required for a finding of waiver on grounds of active involvement in pre-trial activities. <u>See</u> <u>Hill</u>, 179 F.3d at 765 (state agency waived Eleventh Amendment immunity by actively litigating the case on the merits, and waiting to raise its immunity defense until the first day of trial). Reliant's waiver argument regarding DWR's involvement in this litigation is rejected.[24]

In sum, DWR has met its burden of demonstrating that as an arm of the State of California, it is presumptively immune from suit in federal court. Reliant fails to show how the State of California waived this immunity. Accordingly, DWR's motion to dismiss Reliant's third-party complaint is granted.

/ / /

/ / /

---

[24] Reliant further argues that if this court grants DWR's motion to dismiss, it should go one step further and dismiss this entire case for failure to join an indispensable party. <u>See</u> Fed. R. Civ. P. 19(b). DWR is not an indispensable party, however. Under Rule 19(b), the determination of whether a party is indispensable to an action "requires the consideration of four factors: (1) the extent to which a judgment rendered in the person's absence might be prejudicial to the person or those already parties; (2) the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; (3) whether a judgment rendered in the person's absence will be adequate; and (4) whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder." <u>Clinton v. Babbitt</u>, 180 F.3d 1081, 1090 (9th Cir. 1999). None of these factors weighs in favor of declaring DWR an indispensable party. The court can fully and fairly adjudicate the claims presented in ISO's complaint without DWR's presence in this case. Reliant's request is denied.

**3.    The ISO's Motion For A Preliminary Injunction**

The standard for issuing a preliminary injunction is the same as the standard for issuing a temporary restraining order.  See Dumas v. Gommerman, 865 F.2d 1093, 1095 (9th Cir. 1989).  To qualify for a preliminary injunction, the moving party must show (1) a probability of success on the merits, and (2) the possibility of irreparable injury should the restraining order not issue.  See id.  These factors represent two points on a sliding scale, such that "the greater the relative hardship to the moving party, the less probability of success must be shown." Sun Microsystems, Inc. v. Microsoft Corp., 188 F.3d 1115, 1119 (9th Cir. 1999) (citation omitted).

After the ISO filed and the court heard the motion for a preliminary injunction, all defendants but Reliant entered into a stipulation with the ISO pursuant to which those defendants will continue to respond to emergency dispatch instructions until the FERC rules on the February 22 emergency request.  Accordingly, the ISO's motion for a preliminary injunction as to those defendants is denied without prejudice, and the court addresses the appropriateness of a preliminary injunction as to Reliant only.

**A.    Likelihood of Success**

The ISO seeks to compel Reliant to comply with the emergency dispatch instructions.  Reliant is obligated to comply with the provisions of the ISO Tariff by virtue of its participation in the California electricity market and use of the California power grid.  Reliant has also entered into a

Participating Generator Agreement with the ISO, which requires it, as well as the ISO, to comply with the provisions of the ISO Tariff.

Section 5.1.3 of the ISO Tariff provides:

> Each Participating Generator shall take, at the direction of the ISO, such action affecting such Generator, as the ISO determines to be necessary to maintain the reliability of the ISO Controlled Grid. Such actions shall include . . . (a) compliance with the ISO's Dispatch Instructions.

Section 5.6.1 similarly establishes the ISO's authority

> to instruct a Participating Generator to bring its Generating Unit on-line, off-line, or increase or curtail the output of the Generating Unit . . . if such an instruction is reasonably necessary to prevent an imminent or threatened System Emergency or to retain Operational Control . . . during an action System Emergency.

Notwithstanding these express obligations, Reliant contends that its obligation to respond to emergency dispatch instructions is discharged by the absence of a creditworthy buyer.  In other words, Reliant contends that the creditworthiness provisions set forth in the ISO Tariff apply to electricity provided in response to emergency dispatch instructions and scheduled transactions alike.

As outlined in the temporary restraining order, the ISO Tariff requires scheduling coordinators to maintain an "Approved Credit Rating," or alternatively, to maintain security in an amount intended to cover its outstanding and estimated liability.  See ISO Tariff § 2.2.3.2.  It is undisputed that PG&E, SCE and their scheduling coordinator no longer maintain an "Approved Credit Rating" as that term is defined in the ISO Tariff.  Thus, they must post security.

See id. § 2.2.7.3.  Scheduling coordinators that fail to meet these requirements are prohibited from submitting a schedule to the ISO.  See id.  Power is "scheduled" in the advance market, not the real time market. Accordingly, scheduling coordinators that fail to maintain an "Approved Credit Rating" cannot participate in the advance scheduling process.  It does not, however, follow that the ISO Tariff bars the ISO from issuing emergency dispatch instructions to meet the need of customers of scheduling coordinators that do not meet the Tariff's credit requirements.

As detailed above, Amendment No. 36, as adopted by the FERC, partially relieves scheduling coordinators of this responsibility in that it allows them to participate in the advance market despite their failure to maintain an approved credit rating, or alternatively, post security.  FERC's February 14 order does not change the analysis or this court's preliminary conclusion that the creditworthiness provisions apply only to power scheduled in the advance market.

In its supplemental opposition filed the afternoon before the status conference, Reliant argues for the first time that the "ISO's requested injunction would violate the commerce clause."  More particularly, Reliant argues that the ISO's position that its emergency dispatch instructions "trump" any existing contracts California generators have with purchasers in other states undermines federal policy and violates the commerce clause, as it "impedes the development of a broader regional market in the West."

Reliant's argument, however, fails to take into account

30

that the ISO issues emergency dispatch instructions when reliability criteria issued by the Western Systems Coordinating Council ("WSCC") are violated.  <u>See</u> Detmers Decl., filed Mar. 20, 2001, ¶ 7.  According to James Detmers, Acting Vice President of Operations for the ISO, "[t]he WSCC is a reliability counsel for the sub-region of North American Electric Reliability Council ("NERC") which includes the western United States, and portions of Canada and Mexico." <u>Id.</u>  The WSCC's reliability criteria relied on by the ISO were established to protect the entire Western Regional grid, which covers California, Oregon, Washington, Idaho, Nevada, Utah, Colorado, New Mexico, Arizona, Montana, Wyoming and portions of Canada and Mexico.  <u>Id.</u>  Thus, contrary to Reliant's assertions, the ISO does not issue emergency dispatch instructions "at the expense" of its neighbors, but rather pursuant to a set of criteria designed to protect the entire Western region.  Given the above, Reliant's eleventh hour argument that the ISO's issuance of emergency dispatch instructions violates interstate interests rings hollow.

For the reasons set forth above, the court finds that there is a substantial likelihood that the ISO will prevail on the merits.[25]

---

[25] Reliant previously argued that its obligation to comply with the provisions of the ISO Tariff was discharged by the ISO's failure to comply with the ISO Tariff's creditworthiness provisions.  This court rejected that argument, finding that the ISO Tariff has the force and effect of a federal statute, and thus, the ISO's failure to comply with the provisions of the ISO Tariff does not discharge Reliant's duties thereunder, as it might if the ISO Tariff was merely a contract between the parties.  <u>See</u> TRO at 6-7.  <u>Coughlin v. Trans World</u>

**B.   Irreparable Harm**

*(1)  Harm to the Public*

As noted in the court's temporary restraining order, the State of California is confronting an energy crisis of catastrophic proportions.  On January 17, 2001, Governor Gray Davis proclaimed a State of Emergency in response to California's energy crisis.  In January and February of this year, the ISO has declared a series of Stage 3 Emergencies and ordered rolling blackouts on several occasions.

At the February 7, 2001 hearing, Mr. Detmers testified that the ISO has been forced to rely on the real time market for a considerable period of time.  At the March 16, 2001 status conference, counsel for the ISO maintained that the

_____

Airlines, Inc., 847 F.2d 1432 (9th Cir. 1988), relied on by Reliant, does not alter the court's analysis.  In the thirteen years since Coughlin was decided, it has been cited only eight times (three in the Ninth Circuit), and it has never been applied outside the common carrier context.  Nor did that case involve the public interest concerns present here.  No court has given Coughlin the sweeping effect urged by Reliant, and the court declines to do so here.

More importantly, however, Reliant's argument was prefaced on the ISO's unilateral implementation of Amendment No. 36 prior to approval by the FERC.  As noted above, after the court issued its temporary restraining order, the FERC ruled on Amendment No. 36.  In pertinent part, as set forth above, the FERC rejected Amendment 36 "to the extent [it] allow[s] PG&E and SoCal Edison to continue to schedule transactions from third-party suppliers without adequate assurance of payment."  FERC Ord. at 1-2.  There is no evidence, or allegation, that the ISO has breached the FERC's February 14, 2001 order as to purchases made in the advance market.  Rather, Reliant contends that the ISO repudiated that order by failing to extend those requirements to power provided in response to emergency dispatch instructions.  As set forth above, the court rejects this contention.  Accordingly, the ISO is not presently breaching the ISO Tariff or the FERC's February 14 order, and to the extent Reliant argues that its current obligation to respond to emergency dispatch orders is discharged by the ISO's breach, that argument is without merit.

potential threat of imminent irreparable harm has not changed
in any appreciable degree over the past few weeks.  While the
number of emergency dispatch instructions issued in recent
weeks has  declined dramatically, counsel for the ISO
explained that unusual, unexpected events can, and do, occur
and continue to pose an imminent threat of irreparable harm to
the people of the State of California.  <u>See also</u> Detmers
Decl., filed Mar. 20, 2001, ¶¶ 6, 9, and Exs. D, F attached
thereto.  Such unplanned events include generators "falling
off-line," transformer burns, and downed power lines.  <u>Id.</u>
For example, a Stage 2 Emergency was declared on March 14,
2001 when power from out-of-state providers dropped by 1,200
megawatts.  <u>Id.</u> ¶ 3.  Moreover, at approximately 6:00 a.m. on
March 19, 2001, the ISO declared a Stage 2 Emergency due to
insufficient system resources.  By noon that same day, a Stage
3 Emergency was declared after "two units at a facility
tripped offline."  <u>Id.</u> ¶ 4.  Immediately thereafter, the ISO
determined that it was necessary to curtail firm load, and
rolling blackouts again darkened the California landscape.
<u>Id.</u>

     According to Mr. Detmers, the shortfalls in power vary
from 2,000 - 3,000 megawatts to 8,000 - 10,000 megawatts.  A
Stage 3 Emergency occurs when the under-arranged amount ranges
from 7,000 - 8,000 megawatts.  Reliant controls approximately
3,800 megawatts of generating capacity in California.  While
the precise amount of electricity available from Reliant to
respond to emergency dispatch instructions is uncertain and in
dispute, it is nevertheless significant, and its loss poses an

imminent threat of blackouts.  Reliant has never disputed that
such blackouts pose a dire threat to public health and safety.
See Mississippi Power & Light v. United Gas Pipe Line Co., 760
F.2d 618, 623 (5th Cir. 1985) (injury to public may suffice as
irreparable harm in private action); see also Northern Indiana
Pub. Serv. Co. v. Carbon County Coal Co., 799 F.2d 265, 280
(7th Cir. 1986) (injury to public may suffice as irreparable
harm where public is essentially real party in interest).

> *(2) Role of DWR*

Reliant continues to argue that any potential for
irreparable harm could be cured by DWR.  But even assuming DWR
could single-handedly palliate the crisis, the Eleventh
Amendment  precludes this court from subjecting DWR to its
jurisdiction.  Nor, as a practical matter, does it appear DWR
can or will ride to the rescue at any cost.  Indeed, the
evidence suggests otherwise.  As Reliant points out, DWR has
refused to extend the February 16, 2001 agreement pursuant to
which DWR agreed to pay Reliant a certain contract price for
power provided in response to emergency dispatch instructions
until March 23, 2001.[26]  Nor is there any authority that the
ISO can exercise to require DWR to pay Reliant any amount for
electricity.

---

[26] Reliant points to DWR's demonstrated ability to pay for
power provided in response to emergency dispatch instructions,
as evidenced by the February 16 agreement.  According to
Reliant, any potential for irreparable harm is caused by DWR's
refusal to accept the FERC price.  Reliant points out that the
FERC's March 9, 2001 order established $273/MWh as a
presumptively just and reasonable price during Stage 3
Emergencies in California.  To the extent the prices charged
by Reliant exceed that cap, Reliant argues that DWR can seek
review by the FERC.

1    Reliant, in essence, asks this court to do equity.

2 "Equity," in this context, however is circumscribed by the

3 filed rate doctrine.  As a result, and as all of the parties

4 have acknowledged, the court's jurisdiction is, therefore,

5 limited to *enforcing* the tariff.

6    As an alternative to issuing a preliminary injunction,

7 Reliant urges the court to require DWR to contract with

8 Reliant.  Not only does the court lack jurisdiction over DWR,

9 but the court is not aware, nor does Reliant cite to, any

10 authority that empowers the court to force anyone, let alone

11 the State of California, to enter into a contract.

12    The court does not discount the economic harm suffered by

13 Reliant and similarly-situated generators.  However, the

14 potential harm to generators that may result from this order

15 must be put into context.  Electricity provided pursuant to

16 emergency dispatch instructions currently accounts for

17 approximately 12.5% of electricity provided in the relevant

18 market.  Moreover, pursuant to the FERC's order, creditworthy

19 buyers are required for electricity sold in the advance

20 market, which accounts for 75% of the electricity sold in the

21 relevant market.  Thus, this case is not about Reliant not

22 being paid for *any* of the power it provides.[27]  More

23

24    [27] The court notes that despite potential and actual
economic harm to generators posed by the failure of
25 California's public utilities to pay for past purchases, the
ISO and the EOB argue that California's power crisis has been
26 an economic windfall to Reliant and other generators.  See,
e.g., Reliant Press Release, dated Jan. 26, 2001, attached as
27 Ex. E to Application for TRO, filed Feb. 6, 2001; Reliant's
SEC filings, attached as Exs. A-C to EOB's Req. for Judicial
28 Notice, filed Feb. 14, 2001.

importantly, however, purely economic harm is an insufficient

basis upon which to grant or deny a preliminary injunction.

harm.  <u>See</u> <u>Rent-A-Center, Inc. v. Canyon Television &</u>

<u>Appliance Rental, Inc.</u>, 944 F. 2d 597, 603 (9th Cir.1991)

("economic injury alone does not support a finding of

irreparable harm . . .")  Reliant has failed to demonstrate

that its long-term viability is threatened by the relief

sought.

/ / /

In an enforcement action such as this, the court must

enforce the Tariff as it is written.  To the extent Reliant

contends the Tariff is unfair, that is a matter for the FERC,

not this court.  Accordingly, the court finds that the

potential for imminent irreparable harm to the public remains.

**CONCLUSION**

Accordingly, IT IS ORDERED THAT:

1.   Reliant's motion to dismiss or stay the matter in

its entirety is DENIED.

2.   DWR's motion to dismiss Reliant's third-party

complaint is GRANTED.

3.   The ISO's motion for preliminary injunction as to

Dynegy, AES and Williams is DENIED WITHOUT PREJUDICE.

4.   The ISO's motion for a preliminary injunction as to

Reliant is GRANTED.  Reliant shall continue to respond to

emergency dispatch instructions until the FERC issues a ruling

on the pending Request for an Order to Comply.[28]   The parties
shall immediately notify the court of the FERC ruling, and the
court will set the matter for a further status conference
within five days of said notification.   The parties shall file
and serve a joint status conference statement at least one day
prior to such conference.   If no order is issued by the FERC
within 60 days of this order, a further status conference
shall be held on May 25, 2001 at 10:00 a.m.   The parties shall
file and serve a joint status conference statement not later
than May 18, 2001.

      5.   The bonding requirement under Fed. R. Civ. P. 65(c)
is waived, as the ISO, a not-for-profit public benefit
corporation, is unable to post a substantial bond.   See <u>People
of State of California ex rel. Van de Kamp v. Tahoe Regional
Planning Agency</u>, 766 F.2d 1319, 1325 (9th Cir. 1985).

      6.   The ISO's objections to Exhibits H-N to the
Declaration of Thomas S. Hixson In Support of the Supplemental
Opposition to Preliminary Injunction, filed Mar. 15, 2001,
Exhibits A, B & C to Declaration of Thomas S. Hixson In
Support of the Supplemental Opposition to Preliminary
Injunction (Attaching Highly Confidential Documents), filed
Mar. 15, 2001, and Exhibits F, G & H to Hixson Declaration,
are SUSTAINED.   The first two sets of exhibits referred to
above are not relevant, in any appreciable way, to the brief
they purport to support.   The last set of exhibits, press

---

      [28] The stipulation entered into by the ISO, Dynegy and
Williams employs the identical language.   <u>See</u> Stip. & Ord.,
filed Mar. 21, 2001.

1  reports relating to long-term power contracts, constitute
2  inadmissible hearsay.  <u>See</u> Fed. R. Evid. 801.
3       IT IS SO ORDERED.
4  DATED: March 21, 2001.
5
6  ___                          _____
                                FRANK C. DAMRELL, Jr.
                                UNITED STATES DISTRICT JUDGE
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28